## AFFIDAVIT OF VINCENT CHAMBERS

I, Vincent Chambers, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the investigation of Drug Trafficking Organizations, and have been employed by the FBI for approximately one year. My training includes attending the 18-week FBI basic agent training at the FBI Academy, Quantico, Virginia in 2004-2005. I am a currently assigned to the Drug Squad, Boston FBI. My responsibilities include the investigation of crimes involving drug trafficking and drug trafficking organizations.

2. Based on my training and experience, I am aware that is a violation of Title 21, United States Code, Sections 846 and 841(a)(1) for individuals to conspire to distribute cocaine. I submit this affidavit in support of a criminal complaint charging Fernando Salas SICAIROS with conspiracy to distribute cocaine, violation of Title 21, United States Code, Section 846 and 841(a)(1).

3. The statements contained in this affidavit are based my participation in the investigation of the criminal activity described herein, as well as information provided to me by other federal agents involved in this investigation, as well as my experience, training, and background as a Special Agent with the FBI. This affidavit does not discuss all of the evidence

questioning, SALAS SICAIROS said that they had stopped at a hou
and that his brother had gotten out and taken something out of
the trunk, and that he (SALAS SICAIROS) did not know what it wa

27.   Based upon the information above, I have probable
cause to believe that Fernando Salas SICAIROS and others,
including but not limited to Luis VIZCARRA, Jorge TIRADO,
Alejandro RODRIGUEZ, Alejandro GARCILIA, Umberto MEDRANO, have
conspired to distribute cocaine, in violation of Title 21, Unit
States Code, Sections 846 and 841(a)(1).

*Vincent M. Chambers*
Vincent Chambers
Special Agent
Federal Bureau of
Investigation

Sworn and subscribed to me this 14th day of September, 2005

*Judith Gail Dein*
JUDITH G. DEIN
UNITED STATES MAGISTRATE JUD

15

obtained during the investigation, but only that which I believ is necessary to establish probable cause.

4. In July of 2005, Special Agent William White of the Federal Bureau of Investigation received a call from an individual who was interested in cooperating with the FBI in th investigation of a Drug Trafficking Organization ("DTO"). According to this individual ("CW"), prior to his cooperation i this investigation, he was involved in three separate deliverie of cocaine from California to Massachusetts and Rhode Island. one occasion he drove a load of cocaine from California to Rhod Island. As part of the same transaction, CW drove a large amou of cash from Massachusetts back to California. In addition, on two occasions CW took delivery of packages of cocaine shipped v UPS and Federal Express. These transactions are detailed more fully below. In return for his cooperation with the FBI, CW is hoping to receive consideration on several pending criminal matters, including charges of larceny by check, credit card fraud, and restraining order violations. In addition, CW is being compensated by the FBI for his cooperation.

5. According to CW, Umberto MEDRANO ("MEDRANO") is the leader of this DTO and smuggles cocaine from Mexico to Luis VIZCARRA ("VIZCARRA") in California. VIZCARRA is a high rankin member of the DTO who resides in California. VIZCARRA takes shipment of the cocaine from MEDRANO and distributes it, via

2

couriers, to Jorge TIRADO ("TIRADO"), who is responsible for distributing the cocaine in Massachusetts. TIRADO resides at 1 Chester Street, Allston, Massachusetts. CW was introduced to t organization by a friend, Carlos NAVARRO, whom he has known for few years. According to CW, NAVARRO began the Massachusetts operation by introducing VIZCARRA to TIRADO. At some point in time, CW was asked by TIRADO to participate in the DTO by transporting cocaine from California to Rhode Island. CW agree CW's first assignment was to transport a quantity of cocaine fr California to Rhode Island.[1]

6.  In or about July or August, 2004, CW received an instant message at his hotmail account from a member of the DTO The message instructed CW to fly to Salt Lake City, Utah, and rent either a 2003 or 2004 Ford Focus. CW complied with these instructions and then drove to VIZCARRA's residence in Chino Hills, California. When CW arrived at VIZCARRA's residence, th Ford Focus was parked inside VIZCARRA's garage. CW, VIZCARRA, and MEDRANO then removed the car's rear bumper, installed a secret compartment within the bumper, and placed approximately

---

[1] TIRADO and VIZCARRA, as well as Alejandro RODRIGUEZ and Alejandro GARCILIA, were the subjects of prior criminal complaints issued by this Court. On September 14, 2005, TIRADO and Alejandro RODRIGUEZ were arrested, pursuant to arrest warrants issued by this Court, in Allston, MA. On September 13 2005, GARCILIA and VIZCARRA, were arrested, pursuant to arrest warrants issued by this Court, in San Diego, CA.

3

twenty kilograms of cocaine inside the compartment. VIZCARRA then directed CW to drive the car back to Providence, Rhode Island.

7. Upon his arrival in Rhode Island, CW parked the Ford Focus in a friend's garage. Pursuant to instructions from VIZCARRA, CW then picked up VIZCARRA and MEDRANO at Logan International Airport in Boston. CW drove them to the garage i Providence, where CW, VIZCARRA, and MEDRANO removed the cocaine from the hidden compartment. According to CW, other members of the DTO packaged the cocaine into gym bags and then transported the cocaine to TIRADO's apartment at 102 Chester Street, Allstc Massachusetts.

8. A few days later, CW was directed to a house at 18 Sheriden Street in Jamaica Plain. There, CW observed VIZCARRA and other members of the DTO place approximately $600,000 into the hidden compartment in the Ford Focus. Pursuant to instructions from VIZCARRA, CW then transported the $600,000 tc VIZCARRA'S residence in California, where VIZCARRA paid CW $8,C for his work.

9. In or about May 2004, the CW was asked to take deliver of two packages of cocaine that were to be sent by mail. Aroun the same time, an individual using the name Roman Diaz e-mailed

the shipping information for the two packages to TIRADO at TIRADO's hotmail account, tiraido98@hotmail.com. TIRADO then forwarded the e-mail to the CW at his Hotmail account on May 5, 2004. The e-mail contained a Federal Express shipping number a a United Parcel Service ("UPS") shipping number. CW has provid the FBI with a hard copy of these e-mails and an FBI agent has confirmed this information contained within the e-mails. Withi a few days of receiving this e-mail, CW received a Federal Express package at his residence. The package contained one or two kilograms of cocaine. The CW then delivered the package to TIRADO. A few days later, a neighbor of the CW's brought him t second package, which UPS had inadvertently delivered to the neighbor's house. This package contained ten kilograms of cocaine. The CW then delivered the package to TIRADO at 102 Chester Street, Allston, Massachusetts. In exchange, the CW wa to be paid $500.

10. Since providing the information detailed above, CW agreed to make another delivery of cocaine for the DTO under th supervision of FBI and task force agents. According to CW, sometime in June 2005, when CW was living and working in Rhode Island, TIRADO sent him an email soliciting his help in transporting another shipment of cocaine from California to

5

Massachusetts and money from Massachusetts back to California. According to CW, TIRADO sent the e-mail from his Hotmail accour to CW at his Hotmail account. Sometime after agreeing to do th deal with TIRADO, CW moved in with TIRADO at 102 Chester Street Allston, Massachusetts, for the purpose of making himself more readily available to TIRADO and VIZCARRA. On or about August 1 2005, TIRADO notified CW that the he was to travel to Californi on the following morning, August 18, 2005. At the time, it was CW's understanding that VIZCARRA now lived in San Diego, California. CW then notified me. I, in turn, notified other F and task force agents, and then notified San Diego FBI agents.

11. On August 18, 2005, I accompanied CW on his flight to San Diego. Upon arriving in San Diego, CW was equipped with a recording device. CW was picked up at the airport by VIZCARRA and an individual later identified by CW as Alejandro GARCILIA. I, along with other agents, surveilled VIZCARRA, GARCILIA and C to VIZCARRA's residence at 955 Caminito Estrella, Chula Vista, California, where CW stayed with VIZCARRA and GARCILIA until CW departed for Massachusetts on August 21, 2005. According to CW while he was staying at VIZCARRA's residence, CW was directed b VIZCARRA to go to the department of motor vehicles ("DMV") and register a white Ford Focus under his own name, which was to be

6

used as the transport vehicle. CW, accompanied by GARCILIA, drove the white Ford Focus to the RMV and registered the car in his own name. Agents picked up surveillance of CW at the DMV, where they observed CW drive into the parking lot in the white Ford Focus with another male seated in the front passenger seat

12. While staying at VIZCARRA's residence, CW continued t wear the electronic recording device and made occasional phone calls to agents to provide updates on his and VIZCARRA's activities.

13. According to CW, on one of the nights he was staying VIZCARRA's residence, CW used cocaine with VIZCARRA and GARCILI CW stated that he believed it would have looked suspicious if h refused the offer to use cocaine.

14. According to CW, on the afternoon of August 21, 2005, VIZCARRA removed three kilograms of cocaine from the cabinets under a sink in the master bedroom and VIZCARRA, GARCILIA and C packaged the three kilograms of cocaine into a secret compartme hidden under the rear bumper of the white Ford Focus. VIZCARRA at some point had told CW that the three kilograms would be a "test run," and if it went smoothly there would be bigger deliveries in the future. VIZCARRA, GARCILIA and CW then went lunch, driving in VIZCARRA's pick-up truck. After returning fr lunch, CW departed VIZCARRA's residence alone in the Ford Focus I, along with other agents, made contact with CW shortly after

departed the VIZCARRA residence. CW was led to the FBI office San Diego, where agents successfully opened a secret compartment located under the rear bumper of the Ford Focus. Inside, agent located three individual heat-sealed packages of cocaine, each weighing approximately one kilogram. Each package was brick-shaped, with the brick of cocaine being wrapped in cellophane a placed inside a heat sealed bag. Agents also removed registration documents from the car, which listed the seller of the car as Umberto MEDRANO of Automotriz Mazatlan, Tijuana, Mexico.

15. CW was directed by agents to travel to Massachusetts where he was to meet up with agents again. It was the agents' plan to have CW deliver money instead of the cocaine, and to ha CW tell TIRADO that he (CW) found his own buyer to sell the thr kilograms to. As CW traveled to Massachusetts, he maintained telephone contact with agents. On August 26, 2005, CW arrived Massachusetts and met with agents at the FBI office in Boston. While at the FBI office, CW received phone calls from both TIRA and VIZCARRA. Both calls were recorded. During these conversations, both VIZCARRA and TIRADO told CW to deliver the cocaine to TIRADO and not to sell the cocaine on his own. Apparently both VIZCARRA and TIRADO were concerned that CW migh try to sell the cocaine on his own based on previous statements he had made, including a statement to VIZCARRA that he (CW) was

interested in playing a bigger role in the organization and making more money. During a subsequent conversation with TIRADO CW told TIRADO that he was currently in Albany, New York and would arrive in approximately four hours. At this meeting, CW was provided with $66,000 in marked U.S. currency and was instructed to deliver the money to TIRADO as payment for the cocaine. CW was equipped with an electronic recording and transmitting device and proceeded to TIRADO's apartment at 102 Chester Street, Second Floor, Allston, Massachusetts.

16. Agents followed CW to 102 Chester Street, where CW met with TIRADO and an individual named Alejandro RODRIGUEZ, a/k/a "Flaco." According to CW, he was familiar with RODRIGUEZ and knew him to be an associate of TIRADO and VIZCARRA. According CW, RODRIGUEZ was indebted to VIZCARRA because on a prior occasion RODRIGUEZ had lost ten kilograms of VIZCARRA's cocaine valued at approximately $200,000. After the meeting with TIRADO CW was debriefed. According to CW, TIRADO and RODRIGUEZ were angered by the fact that CW showed up with money instead of the cocaine. After calming down, TIRADO and RODRIGUEZ counted the money along with CW and appeared satisfied with the amount of money. RODRIGUEZ then took the money and placed it into a safe in his bedroom. During the meeting, agents monitoring the listening device could hear conversation which was consistent with CW's description of events.

17. Prior to making the return trip to California with the money, CW was informed by TIRADO that VIZCARRA wanted RODRIGUEZ to accompany CW back to California. CW and RODRIGUEZ were to deliver $60,000 to VIZCARRA as payment for the three kilograms, and then were to make another delivery of cocaine from VIZCARRA to TIRADO. On September 2, 2005, agents conducting surveillance observed CW and RODRIGUEZ package $60,000 of the marked currency into the secret hide under the rear bumper of the Ford Focus. The next day, September 3, 2005, CW and RODRIGUEZ departed for California in the Ford Focus. In the early morning of September 6, 2005 CW and RODRIGUEZ arrived in San Diego and spent the night at a local hotel. Upon their arrival, CW contacted a Boston task force agent, who was already in San Diego, to let him know that he had arrived. The next day, VIZCARRA and GARCILIA met with CW and RODRIGUEZ. Later that day, while under surveillance, they returned to VIZCARRA's residence, 955 Caminito Estrella, Chula Vista, California, and the Ford Focus was initially parked in the street in front of the residence. The CW later backed the Ford Focus into the garage and the garage door was shut. According CW, who is currently staying in VIZCARRA's residence and providing occasional updates to agents via telephone calls, the money was then unloaded. CW removed the rear bumper and RODRIGUEZ unloaded the money into a bag being held by GARCILIA.

GARCILIA then took the money and said he was bringing it upstai to VIZCARRA. A short time later, VIZCARRA told CW, RODRIGUEZ a GARCILIA to leave the residence for about an hour.

18. The CW informed agents that he thinks that MEDRANO would be arriving sometime on Sunday, September 11, 2005. CW further advised that VIZCARRA had told CW that he (CW) would be leaving with multiple kilograms of cocaine on Monday, September 12, 2005. Based on this information, the CW indicated that he believed MEDRANO would be delivering the kilograms of cocaine t VIZCARRA's house.

19. Agents established surveillance at VIZCARRA's residence, 955 Caminito Estrella, Chula Vista, California, and maintained periodic contact with CW (when possible given that ( was staying at VIZCARRA's residence).

20. In the late afternoon of September 13, 2005, surveillance agents saw the CW, VIZCARRA, and GARCILIA leave VIZCARRA's house. They drove to a nearby shopping mall, droppe off the CW, and returned to VIZCARRA's house, where they parke their car on the street rather than the garage, where they had previously parked their car. The CW called Boston Police Detective Eduardo Dominguez, who was assigned to the

11

investigation as an FBI Task Force Agent, and told Detective Dominguez that VIZCARRA had told the CW that he had to be out c the house because they had work to do. The CW subsequently called Detective Dominguez and said that VIZCARRA also told the CW that he (the CW) would be leaving for Massachusetts at 4 a.m the next morning.

21. Later that day, agents saw a white Toyota Celica (the "Toyota") back into the driveway of 955 Caminito Estrella, Chul Vista, California, and park next to the garage. The hatchback the Toyota was opened and agents saw an individual standing nea the driver's side of the Toyota walk to the back area and lean into the hatchback area. Agents then saw VIZCARRA come out of the garage and stand near the hatchback. Agents subsequently s the driver of the Toyota (later identified as FERNANDO SALAS SICAIROS) get into the driver's side of the car and the car lei the area (the Toyota was in the driveway for about one minute) Agents then saw VIZCARRA go back into the house.

22. Shortly thereafter, agents saw VIZCARRA and RODRIGUE come out of the house and VIZCARRA picked up an apparently empt cardboard box from the garage area and return to the house.

23. Approximately 10 to 15 minutes later, agents, includi[ng] Detective Dominguez, who is fluent in Spanish, and two marked police cars, conducted an investigatory stop of the Toyota. Th[e] driver of the Toyota provided a Mexican driver's licence in the name FERNANDO SALAS SICAIROS. The passenger of the Toyota provided a Mexican driver's licence in the name CARLOS HUGO SA[LAS] SICAIROS (hereinafter "SALAS SICAIROS").

24. SICAIROS told Detective Dominguez that he and his brother, SALAS SICAIROS, had driven from Mexico to Los Angeles [to] look at a boat they were considering buying and were on their [way] back to Mexico. SICAIROS said that he had wanted to stop at Costco but that his brother was in a rush to return to Mexico [so] they had decided not to go to Costco. Detective Dominguez aske[d] whether they had stopped at a house and SICAIROS said that the[y] had not. When Detective Dominguez asked why they had gotten o[ff] the main highway (the Toyota had exited from Highway 805, whic[h] is the direct route to Mexico) if they were heading back to Mexico, SICAIROS said they were going to a grocery store. Whe[n] Detective Dominguez indicated to SICAIROS that his story made [no] sense, SICAIROS rolled his eyes and said nothing more.

13

25. While this was going on, agents executed arrest warrants and a search warrant, issued by this Court, for 955 Caminito Estrella, Chula Vista, California. This warrant was executed about 10 minutes after SICAIROS left the residence in the Toyota. Agents found a cardboard box in VIZCARRA's bedroom Inside the cardboard box was a black plastic bag with detergent inside. In a bathroom a few feet from, and directly adjacent t the bedroom, agents found approximately three kilograms of cocaine next to the sink. In the sink, agents found a brush ar detergent residue. There was also detergent residue on the kilogram packaging. Among other things, agents also seized fro house the following items: approximately $35,000 in cash, thre scales, drug ledgers, and a can of foam (used for covering drug hidden in a hide in a car).

26. Agents called Detective Dominguez and told him what  3 found in the house and SICAIROS and SALAS SICAIROS were placed under arrest, and Detective Dominguez read both individuals th  r Miranda rights in Spanish (the arrest occurred about 10 to 15 minutes after the initial stop). In response to questioning, SICAIROS said, referring to SALAS SICAIROS, that his brother d not know anything about what was going on. In response to